DIAMOND RESORTS CORPORATION,
a Maryland corporation,

      Plaintiff,

v.

MUTUAL RELEASE CORPORATION a/k/a
417 MRC LLC, a Missouri limited liability
company; DAN CHUDY, an individual;
MATTHEW TUCKER, an individual;
JOSEPH DICKLEMAN, an individual;
THERESE BROOKE PIAZZA, an individual;
NATHANIEL TYLER, an individual;
SHEILA WOOD, an individual; CLS, INC.
d/b/a ATLAS VACATION REMEDIES and
also d/b/a PRINCIPAL TRANSFER GROUP,
a Missouri corporation; DONNELLY
SNELLEN, an individual; and JASON LEVI
HEMINGWAY, an individual,

      Defendants.

Case No.: 6:18-cv-03053-MDH

## REDACTED AMENDED COMPLAINT

Plaintiff, Diamond Resorts Corporation ("Diamond"), through undersigned counsel, sue

Defendants, Mutual Release Corporation a/k/a 417 MRC LLC ("MRC"), Dan Chudy ("Chudy"),

Matthew Tucker ("Tucker"), Joseph Dickleman ("Dickleman"), Therese Brooke Piazza

("Piazza"), Nathaniel Tyler ("Tyler"), Sheila Wood ("Wood"), CLS, Inc. d/b/a Atlas Vacation

Remedies and also d/b/a Principal Transfer Group ("CLS"), Donnelly Snellen ("Snellen"), and

Jason Levi Hemingway ("Hemingway") (collectively "Defendants"), jointly and severally, for

violation of the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836 *et. seq.* for stealing the

business trade secrets of Diamond, for violating the Computer Fraud and Abuse Act, 18 U.S.C. §

1030, as well as for misappropriation of trade secrets pursuant to the Missouri Uniform Trade Secrets Act, §§ 417.450 through 417.467 R.S.Mo. (2011), breach of contract, false advertising, tortious interference, and other causes of action, and states as follows:

## Parties, Jurisdiction, and Venue

1.     Plaintiff, Diamond, is a corporation organized and existing under the laws of the State of Maryland with a principal place of business located at 10600 West Charleston Boulevard, Las Vegas, Nevada 89135.

2.     Defendant MRC is a limited liability company organized and existing under the laws of the State of Missouri with a principal place of business located at 901 E St. Louis Street, Suite 1201, Springfield, Missouri 65806.

3.     Defendant Chudy is an individual and citizen of the State of Missouri.  Upon information and belief, Chudy maintains addresses at 798 Showplace Gateway, Branson, Missouri 65616 and/or 372 Crocodile Avenue, Sparta, Missouri 67573.

4.     Defendant Tucker is an individual and citizen of the State of Missouri.  Upon information and belief, Tucker maintains addresses at 2000 W Murray Drive, Springfield, Missouri 65810 and/or 1344 E Woodland Street, Springfield, Missouri 65804.

5.     Defendant Dickleman is an individual and, upon information and belief, a citizen of the State of Missouri and is otherwise *sui juris*.

6.     Defendant Piazza is an individual and, upon information and belief, a citizen of the State of Missouri and is otherwise *sui juris*.

7.     Defendant Tyler is an individual and, upon information and belief, a citizen of the State of Missouri and is otherwise *sui juris*.

8.     Defendant Wood is an individual and, upon information and belief, a citizen of the State of Missouri and is otherwise *sui juris* (Chudy, Dickleman, Piazza, Tyler, and Wood may sometimes hereinafter be collectively referred to as the "Former Employees").

9.     Chudy and Tucker are both organizers of MRC.  A copy of the Articles of Organization of MRC, as filed with the State of Missouri Secretary of State Corporations Division is annexed hereto as Exhibit 1.

10.    Upon information and belief, Chudy is a manager or managing member, and registered agent, of MRC.

11.    Upon information and belief, Tucker is a manager or managing member of MRC.

12.    CLS, Inc. is a corporation organized and existing under the laws of the State of Missouri that had an alleged principal place of business located at 901 E Saint Louis Street, Suite 1201, Springfield, Missouri 65806.  However, ten days after Plaintiffs sought leave to file their Amended Complaint, Snellen changed the principal address of CLS, Inc. to 708 Missouri Boulevard, Jefferson City, Missouri 65109.[1]  A copy of the Missouri Secretary of State information showing this change is annexed hereto as Exhibit 2.  708 Missouri Boulevard, Jefferson City appears to house an Imo's Pizza, Kim's Nail Salon, Larry's Leather, and Disaster Brigade USA.

13.    CLS owns at least three fictitious names: 'Atlas Vacation Remedies', 'Principal Transfer Group', and 'Principal Transfer Group'.  Copies of the fictitious name registrations filed with the Missouri Secretary of State are annexed hereto as Exhibit 3 and Composite Exhibit 4, respectively.  As with changing the address of CLS after Diamond revealed it learned of the connection between the Defendants, Snellen registered a second, new 'Principal Transfer Group'

---

[1] Diamond is updating its Amended Complaint from the version filed as an exhibit to Plaintiff's Motion for Leave to File Amended Complaint and Incorporated Suggestions in Support Thereof (ECF No. 56) to account for the actions of Defendants after Diamond sought leave to amend.

fictitious name and changed the address of Principal Transfer Group from 901 E Saint Louis Street, Suite 1201, Springfield, Missouri 65806 to 708 Missouri Boulevard, Jefferson City, Missouri 65109.

14.     Donnelly Snellen is an individual and resident of the State of Missouri.  According to the Cole County property records, Snellen is the owner of the real property located at 6906 Route M, Jefferson City, Missouri 65101, which is a single-family, two bedroom, one bathroom home.  Copies of the relevant records are annexed hereto as Composite Exhibit 5.  Snellen is also listed as the owner of CLS and, therefore, the owner of the fictitious names 'Atlas Vacation Remedies' and 'Principal Transfer Group'.

15.     Jason Levi Hemingway is an individual and resident of the State of Missouri. Hemingway was formerly committed to the Missouri Department of Corrections and may presently be reached through, at least, his parole officer, Jennifer Kimberlin, at 2530 South Campbell, Suite H, Springfield, Missouri 65807.  According to court records, Hemingway may reside at 4501 West Westwood Drive, Battlefield, Missouri 65619.

16.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because Plaintiff asserts causes of action under the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836(b) and the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, and pursuant to 15 U.S.C. § 1121 with respect to the causes of action arising under the Lanham Act.  This Court has supplemental jurisdiction over the state law claims brought herein as they form part of the same case or controversy as the federal causes of action.

17.     This Court has personal jurisdiction over Defendants because they are either Missouri residents or doing business in the State of Missouri.

18.     Venue is proper in the Western District of Missouri pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to these claims occurred in this district.

19.     All conditions precedent to the bringing and maintenance of this action have been performed, were waived, would be futile if attempted, or have otherwise occurred or been satisfied.

20.     Diamond has retained the law firm of Shutts & Bowen LLP to represent it in this matter and are obligated to pay it reasonable attorneys' fees and costs.

### Facts Common to All Counts

**A.      General Background**

21.     Diamond, together and in concert with its parent and sister companies, is engaged in the business of timeshare sales, exchange, marketing, and development activities throughout the United States and worldwide under the Diamond Resorts® brand.

22.     Diamond owns real property in Taney County, Missouri, located at 1 Fall Creek Drive, Branson, Missouri 65616.  This property is home, *inter alia*, to a Diamond Resorts® sales office and timeshare resort known as The Suites at Fall Creek.

23.     As part of its ongoing business activities, Diamond, and its parent and sister companies, has developed, maintained, and protected substantial trade secrets.  This information is not readily available to others and includes, but is not limited to:



**B.    Chudy's Employment At Diamond**

24.    Chudy is a former employee of Diamond.

25.    As a condition of, and attendant to, his employment and continued employment at Diamond, Chudy (as well as Dickleman, Piazza, Tyler, and Wood) each individually entered into Confidentiality, Invention & Non-Solicitation Agreement, copies of which is annexed hereto as Exhibits 6, 7, 8, 9, and 10 (collectively the "NSAs").

26.    The NSAs contain a number of provisions, protecting the confidentiality of Plaintiff's information, including the following:

> 2.    <u>CONFIDENTIAL INFORMATION</u>:  I hereby recognize and acknowledge that I will learn and come into contact with certain proprietary information and trade secrets of the Company [Diamond] ("Confidential Information").  I acknowledge that, as used in this Agreement, "Confidential Information" includes, but is not limited to…pricing information, billing histories, customer lists and information…financial data of Company…plans, contractual relationships, projections for new business, opportunities for new or developing business…notes, records…or any other documents generated or compiled by any team member/employee of the Company.  Such information is, and shall remain, the exclusive property of the Company.  I agree that I will not, either during my employment or thereafter, except as authorized or directed by the Company in writing, disclose to others, use for my own benefit, copy or make notes of any Confidential Information.  I recognize and acknowledge that any disclosure to others, use for my own benefit, copying or making notes of any such Confidential Information, unless specifically and expressly authorized by the

---

[2] Due to the sensitive and proprietary nature of some of the information relied upon herein, Plaintiff is filing a redacted Amended Complaint and will thereafter file a sealed, unredacted Amended Complaint pursuant to the operative Protective Order (ECF No. 32, ¶ 9).

Company, will constitute breach by me of the Agreement and that I shall be liable therefor.

3. <u>NO DAMAGE</u>:  Following the termination of my employment with the Company, whether said termination is voluntarily or involuntarily and whether it occurs with or without Cause, I shall not access in any manner any Company Confidential Information or any Company computer network or file for any purpose.

4. <u>TERMINATION</u>:  Upon termination of my employment with the Company, whether said termination is voluntary or involuntary and whether it occurs with or without Cause, I will delivery[sic] to the Company all records, notes, data, discs, memoranda, tapes, programs, models and equipment of any nature which are in my possession and/or control and which are the property of the Company, or which relate to my employment or to the business activities or facilities of the Company, or which otherwise contain Confidential Information.

\*\*\*

*See, e.g.* Exhibit 6, pp. 1, 2 (underlining in original).

27.     In the NSAs, Chudy (as well as Dickleman, Piazza, Tyler, and Wood), each individually  agreed, *inter alia*, that:

I acknowledge and agree that any violation of the restrictions contained in the Agreement would cause the Company substantial irreparable injury and is cause for immediate termination.  I agree that a remedy at law for any breach of the covenants or other obligations in this Agreement would be inadequate and that the Company, in addition to any other remedies available, shall be entitled to obtain preliminary and permanent injunctive relief to secure specific performance of such covenants and to prevent a breach or contemplated breach of this Agreement without necessity of pro[v]ing actual damage.

*See, e.g.,* Exhibit 6, p. 4.

28.     Chudy signed his NSA in August of 2013, and Dickleman, Piazza, Tyler, and Wood signed their respective NSAs on the dates shown thereon.

29.     Chudy was employed by Diamond as a Director of Sales.

30.     As a Director of Sales, Chudy had access to a number of Diamond computers and software systems, including an internal Diamond system known as 'Clarity.'

31.     Clarity is a custom-to-Diamond web-hosted software package that provides an interface between certain Diamond employees and a database of information maintained by Diamond.

## C.     Chudy Quits Diamond to Create MRC, a Timeshare Exit Company

32.     Chudy submitted a resignation of employment letter to Diamond on January 9, 2018, effective that same day.

33.     Upon information and belief, Chudy left Diamond to work at MRC.

34.     MRC is what is known in the industry as a "timeshare exit company."  Timeshare exit companies induce timeshare owners, including Diamond's clients, to breach their valid timeshare contracts with timeshare companies, like Diamond and its parent and sister companies.

35.     Timeshare exit companies often charge consumers exorbitant upfront fees while failing to disclose to consumers what, exactly, the timeshare exit company will do for the consumer.

36.     In fact, timeshare exit companies frequently mislead consumers, either through blatantly false statements, or statements that, while potentially literally true, are misleading or only partially true.

37.     For example, timeshare exit companies frequently state or imply that they have some sort of 'method' or special 'method' to assist consumers in 'exiting' their timeshare contracts, or that they are former timeshare employees who have special knowledge or skills relating to exiting timeshare contracts.  Timeshare exit companies also frequently state or imply that consumers need to retain them because of their 'method' or 'skills' or 'connections' and that

it will provide consumers with an advantage of some type in attempting to cancel their timeshare contracts. In reality, timeshare exit companies have no method of helping consumers exit their timeshare contracts as no such method exists separate and apart from any program a timeshare company may choose to offer direct to consumers.

38.    What these companies frequently do is fail to disclose to the consumers that they will, in fact, do very little, if anything, for the consumer and frequently cause the member to breach their agreements, force the consumer's timeshare interest into default and eventually foreclosure, after which the timeshare exit company claims that it helped the consumer "exit" their timeshare contract. Frequently, the consumer is not aware that their timeshare interest was actually foreclosed and their credit rating adversely impacted. In sum, consumers are persuaded to pay timeshare exit companies for illusory services and/or "services" that breach their timeshare agreements with the timeshare company.

39.    For illustrative purposes, a common form of the timeshare exit company scheme works as follows. The timeshare exit company solicits timeshare owners, promising that the timeshare exit company can help the timeshare owner 'effectively' or 'legally' exit their timeshare contract. The timeshare exit company extracts an up-front payment (sometimes financed over time by the timeshare exit company itself) from the consumer. The timeshare exit company then uses an attorney to send a demand letter to the timeshare company – this attorney is retained directly by the timeshare exit company, not the consumer, but purports to represent the consumer. The demand letters usually state that the consumer wishes to cancel their timeshare, sometimes cite to irrelevant legal decisions, and tell the timeshare operator not to contact the consumer. Sometimes the demand letters reference the Fair Debt Collection Practices Act to further prevent any communication from the timeshare operator to the timeshare owner. Simultaneously, the

timeshare exit company directs the timeshare owner not to speak to the timeshare operator and not to pay maintenance fees. Thus, the timeshare exit company has prevented the timeshare operator and timeshare owner from communicating with each other while directing the timeshare owner to take actions that will result in the timeshare owner defaulting on their timeshare contract and, eventually, a foreclosure of that interest. After the foreclosure the timeshare exit company will claim it helped the consumer 'exit' their timeshare contract.

**D.      Chudy Improperly Accessed Diamond's Computers and Stole Trade Secrets**

40.      Diamond has discovered that Chudy had actually been planning his departure from Diamond for some time. It was during this time period, and potentially for some unknown period of time prior,[3] that Chudy improperly accessed Diamond's computers and computer systems, including, *inter alia*, Clarity, improperly accessed the Trade Secrets, and improperly (and illegally) distributed those Trade Secrets to others, including Tucker.

41.      For example, according to the ICANN WHOIS data for MRC's website shows that it was registered on December 15, 2017. A copy of the ICANN WHOIS data for www.mutualreleasecorp.com is annexed hereto as Exhibit 11.

42.      Chudy was actively designing the website for MRC while still employed at Diamond. On December 18, 2017, Chudy emailed himself (from his Diamond email account to his personal email account) a stylized image of a lion (the "Lion Logo"). A copy of this email, including its attachment, is annexed hereto as Exhibit 12. The Lion Logo now appears as the MRC corporate logo, a copy of which is annexed hereto as Exhibit 13.

43.      Upon information and belief, Chudy was also actively recruiting other Diamond employees to leave their employment at Diamond and join Chudy at MRC. For example, during

---

[3] Diamond's investigations, including a forensic investigation, are ongoing.

December 2017, Chudy requested the pay and compensation information for Dickleman from a Sales and Marketing Administrative Manager at Diamond. Dickleman resigned his employment at Diamond on January 23, 2018 and now works at MRC and has been representing MRC at events hosted by MRC in other states (such as the Commonwealth of Massachusetts) designed to recruit potential customers to MRC.

44. Most insidiously, Chudy spent substantial time at Diamond improperly accessing Diamond's computers and computer systems to steal Diamond's Trade Secrets for use by Chudy and his cohorts and co-conspirators at MRC.

45. During Diamond's investigation, Diamond has discovered that Chudy had accessed certain PowerPoint presentations and emailed them to Tucker. An example of one of these emails (without its confidential attachment) is annexed hereto as Exhibit 14.

46. The Clarity system keeps a log of certain user activity within the system. These logs show, *inter alia*, when a user, such as Chudy, accesses the Clarity system, searches for Diamond customers within the Clarity system, accesses certain classes of customer information within the Clarity system, and requests customer contracts from the Clarity system.

47. Diamond has discovered that Chudy has, for at least a period of months, been engaging in unusual and unnecessary access, searching, and requests within the Clarity system.

48. For example, Diamond has discovered that Chudy was requesting information on Diamond customers, ███████████████████, from the Clarity system. ███ ███████████████████.

49. Upon information and belief, Chudy has used this information, and intends to further use this information, together with other information improperly taken from Diamond, at

MRC, and has distributed this information to the other Defendants, to solicit Diamond's customers to retain MRC to attempt to breach their legally binding contracts with Diamond.

50. Upon information and belief, Chudy and the Defendants are also using information stolen from Diamond to design their 'road shows' and 'dinner pitches' in an effort to solicit Diamond clients and induce them into breaching their timeshare agreements.

51. By way of example, and not limitation, a typical scheme engaged in by Chudy using the misappropriated Trade Secrets is as follows:



52. The foregoing is only an example and made for illustrative purposes only. Diamond has examples of over 1,000 instances of Chudy's improper accesses of the Clarity system, which have been previously filed under seal in the above-captioned civil action.

53. The Trade Secrets are not generally known within Diamond and were not known by anyone outside of Diamond. The Trade Secrets are protected from disclosure and access to them is restricted. The Trade Secrets relate to services offered interstate commerce as Diamond's customers and properties are spread across the United States.

54. Diamond, and its parent and sister companies, have expended substantial time and resources developing, maintaining, and protecting the Trade Secrets.

55. MRC is a competitor with Diamond in that MRC's sole business activities are dedicated to inducing consumers into breaching their timeshare agreements with timeshare companies, like Diamond. Thus, MRC's sole business activity is dedicated to attempting to take a timeshare owner, such as a Diamond customer, inducing that person into breaching their timeshare agreement, and then actually facilitating such a breach. Thus, a consumer can be either a customer of Diamond or a customer of MRC but not both as Diamond and MRC are diametrically opposed businesses. There is therefore a one-to-one relationship between Diamond and MRC when it comes to customers – if MRC induces a consumer to breach a Diamond timeshare agreement, MRC will gain a customer while Diamond will lose a customer as MRC's customers always breach their timeshare agreements.

E. **Diamond Discovers Chudy and Tucker's Co-Conspirators**

56. Since filing the original complaint in this matter, Diamond, through its investigative efforts, has discovered that Chudy, Tucker, and the other Former Employees did not act alone.

57.    MRC lists as its principal business address an office suite located at 901 East Saint Louis Street, Suite 1201, Springfield, Missouri 65806 (the "Springfield Address").

58.    MRC is, however, not the only business located at the Springfield Address.

59.    CLS d/b/a Atlas Vacation Remedies does business utilizing, *inter alia*, a website located at www.atlasvacationremedies.com and through a physical place of business located at 901 East Saint Louis Street, Suite 1201, Springfield, Missouri 65806 – that is, the Springfield Address.

60.    Likewise, CLS d/b/a Principal Transfer Group does business utilizing, *inter alia*, a website located at www.principaltransfergroup.com and through a physical place of business located at 901 East Saint Louis Street, Suite 1201, Springfield, Missouri 65806 – once again, the Springfield Address.

61.    Thus, there are at least three separate businesses operating out of the Springfield Address – MRC, CLS d/b/a Atlas Vacation Remedies, and CLS d/b/a Principal Transfer Group. There are even more links between these entities.

62.    MRC was formed on December 26, 2017.  While Chudy and Tucker signed the 'Articles of Organization' for MRC, in the box for "Name and address to return filed document", Hemingway is listed.  *See* Exhibit 1.

63.    The Registration of Fictitious Name for 'Atlas Vacation Remedies' on behalf of CLS was signed by Snellen on January 4, 2018.  In the box for "Name and address to return filed document", Hemingway is listed.  *See* Exhibit 3.

64.    The Registration of Fictitious Name for 'Principal Transfer Group' on behalf of CLS was signed by Snellen on January 4, 2018.  In the box for "Name and address to return filed document", Hemingway is listed.  *See* Exhibit 4.

65.     Thus, within the span of approximately one week, Chudy and Tucker formed MRC and Snellen registered 'Atlas Vacation Remedies' and 'Principal Transfer Group', all of the foregoing working with Hemingway, and co-locating these three new businesses in the same office suite.

66.     Like MRC, CLS d/b/a Atlas Vacation Remedies and CLS d/b/a Principal Transfer Group are timeshare exit companies.

67.     CLS d/b/a Atlas Vacation Remedies and CLS d/b/a Principal Transfer Group are both engaged in false and misleading advertising.  Indeed, the websites for both CLS d/b/a Atlas Vacation Remedies and CLS d/b/a Principal Transfer Group, while appearing superficially to be different are, in many instances, identical.  One example is the 'Customer Reviews' on the Atlas Vacation Remedies website and the 'Customer Testimonials' on the Principal Transfer Group website.  Both the Atlas Vacation Remedies website and the Principal Transfer Group website list the following 'reviews'/'testimonials':

a.   "I would recommend Principal Transfer Group[4] to anyone looking to get out of their timeshare.  We are free and clear of ours and couldn't be happier!  Thank you!  - Susan M.";

b.   "Everyone that I spoke with and everyone that I worked with were very professional, honest and stayed in contact with me throughout the process.  I would recommend this company to anyone that needs to get out of their timeshare.  – Pam S."; and

---

[4] This is not a typo, the 'Customer Review' for 'Susan M.' on the Atlas Vacation Remedies website refers to Principal Transfer Group.

c. "Our consultant was very understanding of our particular situation and worked with us to find the best fit for us from the program they have in place. I would highly recommend that anyone looking to get out of their timeshare to give them a call. There are no high-pressure sales tactics with this company. We asked for a few days to look things over and call them back. We called them a week later and the deal was still good. We are now timeshare free and could not be happier. Thanks Principal Transfer Group! - Thomas J.".

Clearly, Susan M., Pam S., and Thomas J. are not real people and these 'customer reviews'/'customer testimonials' are either literally false or deceptively misleading as they 'describe' fake experiences that never occurred by non-existent customers.

68. Similarly, the Atlas Vacation Rentals website and the Principal Transfer Group website both have a 'Frequently Asked Questions' section that contains identical, or nearly identical, text. These 'Frequently Asked Questions' contain statements that are either literally false or deceptively misleading, such as:

a. "Will my name be off the Timeshare ownership documents? Yes! Ownership is legitimately transferred. Depending on the property of record, title is transferred via deed, membership, lease, assignment, or as required by resort official governing documents (covenants, conditions, restrictions)."; and

b. "What happens if you are unsuccessful at exiting me from my timeshare? In the very rare situation that we are unable to obtain a successful exit

opportunity, we proudly stand by our 100% money back guarantee and you will receive a full refund of your fee."

These statements are either literally false or deceptively misleading as CLS d/b/a Atlas Vacation Rentals and CLS d/b/a Principal Transfer Group do not have a valid, legal, or otherwise legitimate means of assisting consumers in exiting their timeshare obligations. Instead, CLS d/b/a Atlas Vacation Rentals and CLS d/b/a Principal Transfer Group cause timeshare owners to be foreclosed upon or engage in fraudulent, unapproved transfers of property through quit-claim deeds, or engage in otherwise fraudulent, unapproved transfers of property utilizing straw-men. These activities are considered 'successful' exits by CLS d/b/a Atlas Vacation Rentals and CLS d/b/a Principal Transfer Group and therefore do not qualify a consumer for a refund of the extraordinary fees they pay to CLS d/b/a Atlas Vacation Rentals, CLS d/b/a Principal Transfer Group, and/or MRC despite the fact that the activities of CLS d/b/a Atlas Vacation Rentals, CLS d/b/a Principal Transfer Group, and/or MRC described above cause substantial harm to the consumers (such as by destroying their credit rating) and/or do not actually relieve the consumers of their obligations under their timeshare contracts (such as in the case of fraudulent transfers).

69.     Upon information and belief, CLS d/b/a Atlas Vacation Rentals, CLS d/b/a Principal Transfer Group, and MRC, together with the other defendants named in this action, are working together to share information, share clients, and mask their activities. Upon information and belief, the sharing of information includes, but is not limited to, sharing of the stolen Trade Secrets.

70.     CLS d/b/a Atlas Vacation Rentals is a direct competitor of Diamond in that CLS d/b/a Atlas Vacation Rentals' sole business activities are dedicated to inducing consumers into breaching their timeshare agreements with timeshare companies, like Diamond. Thus, CLS d/b/a

Atlas Vacation Rentals' sole business activity is dedicated to attempting to take a timeshare owner, such as a Diamond customer, inducing that person into breaching their timeshare agreement, and then actually facilitating such a breach. Thus, a consumer can be either a customer of Diamond or a customer of CLS d/b/a Atlas Vacation Rentals but not both as Diamond and CLS d/b/a Atlas Vacation Rentals are diametrically opposed businesses. There is therefore a one-to-one relationship between Diamond and CLS d/b/a Atlas Vacation Rentals when it comes to customers – if CLS d/b/a Atlas Vacation Rentals induces a consumer to breach a Diamond timeshare agreement, CLS d/b/a Atlas Vacation Rentals will gain a customer while Diamond will lose a customer as CLS d/b/a Atlas Vacation Rentals' customers always breach their timeshare agreements.

71. CLS d/b/a Principal Transfer Group is a direct competitor of Diamond in that CLS d/b/a Principal Transfer Group's sole business activities are dedicated to inducing consumers into breaching their timeshare agreements with timeshare companies, like Diamond. Thus, CLS d/b/a Principal Transfer Group's sole business activity is dedicated to attempting to take a timeshare owner, such as a Diamond customer, inducing that person into breaching their timeshare agreement, and then actually facilitating such a breach. Thus, a consumer can be either a customer of Diamond or a customer of CLS d/b/a Principal Transfer Group but not both as Diamond and CLS d/b/a Principal Transfer Group are diametrically opposed businesses. There is therefore a one-to-one relationship between Diamond and CLS d/b/a Principal Transfer Group when it comes to customers – if CLS d/b/a Principal Transfer Group induces a consumer to breach a Diamond timeshare agreement, CLS d/b/a Principal Transfer Group will gain a customer while Diamond will lose a customer as CLS d/b/a Principal Transfer Group customers always breach their timeshare agreements.

72.     Upon information and belief, all of the foregoing, including, without limitation, the theft of the Trade Secrets, is part of an overall strategy on the part of Defendants to contact Diamond's customers and attack Diamond's business.

73.     Upon information and belief, Chudy, Tucker, Snellen, and Hemingway have personally directed and/or engaged in the actions set forth hereinabove.  Upon information and belief, the legal fictions of MRC, CLS d/b/a Atlas Vacation Rentals and CLS d/b/a Principal Transfer Group are nothing but mere shells formed to engage in unlawful enterprises.

74.     Upon information and belief, Tucker, Snellen, and Hemingway, as well as all of the Former Employees, have all received the stolen Trade Secrets.

75.     Upon information and belief, many, if not all of the Diamond customers who have breached their timeshare obligations by utilizing Defendants would not have done so had they been told the truth by the Defendants, and therefore were not predisposed to breach their timeshare obligations.

76.     As a direct and proximate result of these actions, Diamond has suffered damages, which are ongoing.

**COUNT I**
**Violations of the Defend Trade Secrets Act of 2016**
**(18 U.S.C. § 1836(b)) (Against All Defendants)**

77.     Diamond re-alleges and incorporates paragraphs 1 through 55, 69, and 72 through 76 as if fully set forth hereinbelow.

78.     This is an action for misappropriation of trade secrets pursuant to the Defend Trade Secrets Act of 2016 (the "DTSA"), 18 U.S.C. § 1836(b).

79. Diamond's Trade Secrets are trade secrets as contemplated by 18 U.S.C. § 1836(b)(1) and within the meaning of 18 U.S.C. § 1839(3). These Trade Secrets are used in interstate commerce as Diamond's customers and operations are spread across the United States.

80. Diamond's confidential information derives independent economic value from not being generally known to, or readily ascertainable through proper means by, other persons, such as timeshare exit companies like MRC, who could obtain economic value from the disclosure or use of the information as contemplated by 18 U.S.C. § 1839(3)(B).

81. At all relevant times, Diamond took reasonable measures to keep such information secret pursuant to 18 U.S.C. § 1839(3)(A). These measures include, but are not limited to, requiring employees to sign NSAs, protecting the Trade Secrets behind restricted login portals, and tracking (and otherwise monitoring or logging) access to the Trade Secrets.

82. Defendants misappropriated Diamond's trade secrets by knowingly acquiring the trade secrets through theft, misrepresentation, and/or by breaching, or inducing Diamond employees to breach, a duty to maintain secrecy.

83. Defendants' improper acquisition, use, and/or disclosure of Diamond's Trade Secrets and confidential information has caused immediate and will cause and irreparable damage to Diamond as proscribed by 18 U.S.C. § 1839(5) and its subsections.

84. Diamond cannot be assured that Defendants will not continue to misappropriate, disclose or use additional trade secret and confidential information in the future, and Diamond will continue to suffer immediate and irreparable harm if Defendants are not enjoined from such disclosure or use on a temporary, preliminary and permanent basis.

**WHEREFORE**, Diamond respectfully requests that this Court:

a. preliminarily, temporarily, and permanently enjoin Defendants, and anyone acting in concert with the Defendants, from using Diamond's Trade Secrets (including but not limited to, soliciting Diamond's owners and members, or to devise programs to cause timeshare customers to "exit" their timeshare contracts), releasing, disclosing, sharing, distributing Diamond's Trade Secrets to any third party, or otherwise misappropriating to any third party, or otherwise misappropriating Diamond's Trade Secrets and require Defendants to return or destroy any copies or electronically stored versions of Diamond's Trade Secrets in Defendants' possession, custody or control pursuant to 18 U.S.C. § 1836(3)(A);

b. enter an *ex parte* order directing the U.S. Marshal Service to locate, seize, and sequester Diamond's Trade Secrets pursuant to 18 U.S.C. § 1836(b)(2)(A);

c. award Diamond damages equivalent to the actual loss caused by Defendants' misappropriation of Diamond's Trade Secrets, and additional damages for any unjust enrichment caused by the misappropriation of Diamond's Trade Secrets that is not addressed in computing damages for actual loss pursuant to 18 U.S.C. § 1836(3)(B)(i);

d. award Diamond exemplary damages for Defendants' willful and malicious misappropriation of Diamond's Trade Secrets in an amount not more than two (2) times the amount of the damages awarded under the aforementioned subparagraph (B) of the DTSA as provided in 18 U.S.C. § 1836(3)(C);

e. award Diamond's costs and reasonable attorneys' fees incurred in bringing this action, and award pre- and post-judgment interest;

f. require Defendants to return all trade secrets, confidential information, or proprietary information unlawfully obtained or retained to Diamond; and

g. grant Plaintiffs any further relief the Court deems just and proper.

### COUNT II
### Misappropriation of Trade Secrets under Missouri's Uniform Trade Secrets Act
### §§ 417.450 through 417.467 R.S.Mo. (2011) (Against All Defendants)

85.     Diamond re-alleges and incorporates paragraphs 1 through 55, 69, and 72 through 76 as if fully set forth hereinbelow.

86.     This is an action for misappropriation of trade secrets pursuant §§ 417.450 through 417.467 R.S.Mo. (2011).

87.     Diamond's Trade Secrets derive independent economic value from not being generally known to, or readily ascertainable through proper means by, other persons who could obtain economic value from the disclosure or use of the information.

88.     At all relevant times, Diamond took reasonable measures to keep such information secret.

89.     Defendants misappropriated Diamond's Trade Secrets by knowingly acquiring the Trade Secrets through theft, misrepresentation, and/or by inducing Diamond employees to breach a duty to maintain secrecy, causing immediate and potentially irreparable damage to Diamond.

90.     Defendants' misappropriation of Diamond's Trade Secrets was willful and malicious.

91.     Diamond cannot be assured that Defendants will not continue to misappropriate, disclose or use additional trade secret and confidential information, and Diamond will continue to suffer immediate and irreparable harm if Defendants are not enjoined from such disclosure or use on a preliminary and permanent basis.

**WHEREFORE**, Diamond respectfully requests that this Court:

a. preliminarily, temporarily, and permanently enjoin Defendants from using Diamond's

Trade Secrets (including , but not limited to, soliciting Diamond's timeshare customers or to devise programs to cause timeshare customers to "exit" timeshare contracts), releasing, disclosing, sharing, distributing, Diamond's Trade Secrets to any third party, or otherwise misappropriating Diamond's Trade Secrets to any third party, and require Defendants to return or destroy any copies or electronically stored versions of Diamond's trade secrets in Defendants' possession, custody or control;

b.  award Diamond damages equivalent to the actual loss caused by Defendants' misappropriation of Diamond's Trade Secrets, and additional damages for any unjust enrichment caused by the misappropriation of Diamond's trade secrets that is not addressed in computing damages for actual loss;

c.  award Diamond costs and reasonable attorneys' fees incurred in bringing this action, and pre- and post-judgment interest;

d.  require Defendants to return all trade secrets, confidential information, or proprietary information unlawfully obtained or retained to Diamond; and

e.  grant Diamond any further relief the Court deems just and proper.

## COUNT III
## Violation of Computer Fraud and Abuse Act 18 U.S.C. § 1030 (Against Chudy Only)

92.    Diamond re-alleges and incorporates paragraphs 1 through 55, 69, and 72 through 76 as if fully set forth hereinbelow.

93.    This is a cause of action for violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030.

94.    Chudy accessed a protected computer at Diamond.

95.    Chudy did so without authorization or by exceeding such authorization as was granted.

96.     Chudy did so knowingly and with the intent to defraud and/or steal the Trade Secrets.

97.     As a result of Chudy's actions, he obtained the Trade Secrets, which have value to Diamond.

98.     As a result, Chudy has caused Diamond damages.

**WHEREFORE**, Diamond respectfully requests that this Court, enter a final judgment in its favor and against Chudy, awarding Diamond damages, attorneys' fees, costs, and pre- and post-judgment interest, and for such other and further relief as this Court deems appropriate.

## COUNT IV
### Breach of Contract (Against Chudy Individually)

99.     Diamond realleges paragraphs 1 through 55, 69, and 72 through 76 as if fully set forth hereinbelow.

100.    This is a cause of action for breach of contract.

101.    The NSA between Diamond and Chudy constitutes a valid and binding contract between Diamond and Chudy.

102.    Chudy breached his NSA by misappropriating, using, and/or disclosing Diamond's Confidential Information, and by soliciting other Diamond employees.

103.    Chudy's breach of his NSA was material.

104.    As a result of Chudy's material breach of his NSA, Diamond has suffered damages.

105.    Pursuant to the terms of the NSA, this count is to apply the laws of the State of Nevada.

**WHEREFORE**, Diamond respectfully requests that this Court, enter a final judgment in its favor and against Chudy, individually, jointly and severally, awarding Diamond damages,

attorneys' fees, costs, and pre- and post-judgment interest, granting Diamond both preliminary and permanent injunctions, and for such other and further relief as this Court deems appropriate.

## COUNT V
### Breach of Contract (Against Dickleman Individually)

106.    Diamond realleges paragraphs 1 through 55, 69, and 72 through 76 as if fully set forth hereinbelow.

107.    This is a cause of action for breach of contract.

108.    The NSA between Diamond and Dickleman constitutes a valid and binding contract between Diamond and Dickleman.

109.    Dickleman breached his NSA.

110.    Dickleman's breach of his NSA was material.

111.    As a result of Dickleman's material breach of his NSA, Diamond has suffered damages.

112.    Pursuant to the terms of the NSA, this count is to apply the laws of the State of Nevada.

**WHEREFORE**, Diamond respectfully requests that this Court, enter a final judgment in its favor and against Dickleman, individually, jointly and severally, awarding Diamond damages, attorneys' fees, costs, and pre- and post-judgment interest, granting Diamond both preliminary and permanent injunctions, and for such other and further relief as this Court deems appropriate.

## COUNT VI
### Breach of Contract (Against Piazza Individually)

113.    Diamond realleges paragraphs 1 through 55, 69, and 72 through 76 as if fully set forth hereinbelow.

114.    This is a cause of action for breach of contract.

115.     The NSA between Diamond and Piazza constitutes a valid and binding contract between Diamond and Piazza.

116.     Piazza breached her NSA.

117.     Piazza's breach of her NSA was material.

118.     As a result of Piazza's material breach of her NSA, Diamond has suffered damages.

119.     Pursuant to the terms of the NSA, this count is to apply the laws of the State of Nevada.

**WHEREFORE**, Diamond respectfully requests that this Court, enter a final judgment in its favor and against Piazza, individually, jointly and severally, awarding Diamond damages, attorneys' fees, costs, and pre- and post-judgment interest, granting Diamond both preliminary and permanent injunctions, and for such other and further relief as this Court deems appropriate.

## COUNT VII
## Breach of Contract (Against Tyler Individually)

120.     Diamond realleges paragraphs 1 through 55, 69, and 72 through 76 as if fully set forth hereinbelow.

121.     This is a cause of action for breach of contract.

122.     The NSA between Diamond and Tyler constitutes a valid and binding contract between Diamond and Tyler.

123.     Tyler breached his NSA.

124.     Tyler's breach of his NSA was material.

125.     As a result of Tyler's material breach of his NSA, Diamond has suffered damages.

126.     Pursuant to the terms of the NSA, this count is to apply the laws of the State of Nevada.

**WHEREFORE**, Diamond respectfully requests that this Court, enter a final judgment in its favor and against Tyler, individually, jointly and severally, awarding Diamond damages, attorneys fees, costs, and pre- and post-judgment interest, granting Diamond both preliminary and permanent injunctions, and for such other and further relief as this Court deems appropriate.

## COUNT VIII
### Breach of Contract (Against Wood Individually)

127. Diamond realleges paragraphs 1 through 55, 69, and 72 through 76 as if fully set forth hereinbelow.

128. This is a cause of action for breach of contract.

129. The NSA between Diamond and Wood constitutes a valid and binding contract between Diamond and Wood.

130. Wood breached her NSA.

131. Wood's breach of her NSA was material.

132. As a result of Wood's material breach of her NSA, Diamond has suffered damages.

133. Pursuant to the terms of the NSA, this count is to apply the laws of the State of Nevada.

**WHEREFORE**, Diamond respectfully requests that this Court, enter a final judgment in its favor and against Wood, individually, jointly and severally, awarding Diamond damages, attorneys' fees, costs, and pre- and post-judgment interest, granting Diamond both preliminary and permanent injunctions, and for such other and further relief as this Court deems appropriate.

## COUNT IX
### Breach of Duty of Loyalty (Against Chudy Individually)

134. Diamond realleges paragraphs 1 through 55, 69, and 72 through 76 as if fully set forth hereinbelow.

135. This is a cause of action for breach of duty of loyalty.

136. Upon information and belief, Chudy induced or otherwise encouraged the other Former Employees to terminate their employment with Diamond and to instead work for Chudy, Tucker, and MRC.

137. Upon information and belief, as he was planning his departure from Diamond, and in anticipation of joining MRC, Chudy undertook a scheme to further harm Diamond by engaging in sales practices that did not comply with Diamond's standards.

138. Upon information and belief, Chudy deliberately engaged in sales practices he knew were inappropriate in order to create consumer complaints against Diamond and force Diamond to have to take actions to protect its business and reputation, and to resolve consumer complaints deliberately created by Chudy.

139. Chudy breached his duty of loyalty to Diamond by utilizing Diamond's trade secrets against Diamond and by using sales tactics in an effort to harm Diamond.

140. Diamond has suffered damages as a result thereof.

**WHEREFORE**, Diamond respectfully requests that this Court, enter a final judgment in its favor and against Chudy, individually, jointly and severally, awarding Diamond damages, attorneys' fees, costs, and pre- and post-judgment interest, and for such other and further relief as this Court deems appropriate.

## COUNT X
### Breach of Duty of Loyalty (Against Dickleman Individually)

141. Diamond realleges paragraphs 1 through 55, 69, and 72 through 76 as if fully set forth hereinbelow.

142. This is a cause of action for breach of duty of loyalty.

143. Upon information and belief, Dickleman induced or otherwise encouraged the other

Former Employees to terminate their employment with Diamond and to instead work for Chudy, Tucker, and MRC.

144.     Upon information and belief, as he was planning his departure from Diamond, and in anticipation of joining MRC, Dickleman undertook a scheme to further harm Diamond by engaging in sales practices that did not comply with Diamond's standards.

145.     Upon information and belief, Dickleman deliberately engaged in sales practices he knew were inappropriate in order to create consumer complaints against Diamond and force Diamond to have to take actions to protect its business and reputation, and to resolve consumer complaints deliberately created by Dickleman.

146.     Dickleman breached his duty of loyalty to Diamond by utilizing Diamond's trade secrets against Diamond and by using sales tactics in an effort to harm Diamond.

147.     Diamond has suffered damages as a result thereof.

**WHEREFORE**, Diamond respectfully requests that this Court, enter a final judgment in its favor and against Dickleman, individually, jointly and severally, awarding Diamond damages, attorneys' fees, costs, and pre- and post-judgment interest, and for such other and further relief as this Court deems appropriate.

## COUNT XI
## Breach of Duty of Loyalty (Against Piazza Individually)

148.     Diamond realleges paragraphs 1 through 55, 69, and 72 through 76 as if fully set forth hereinbelow.

149.     This is a cause of action for breach of duty of loyalty.

150.     Upon information and belief, Piazza induced or otherwise encouraged the other Former Employees to terminate their employment with Diamond and to instead work for Chudy, Tucker, and MRC.

151. Upon information and belief, as she was planning her departure from Diamond, and in anticipation of joining MRC, Piazza undertook a scheme to further harm Diamond by engaging in sales practices that did not comply with Diamond's standards.

152. Upon information and belief, Piazza deliberately engaged in sales practices she knew were inappropriate in order to create consumer complaints against Diamond and force Diamond to have to take actions to protect its business and reputation, and to resolve consumer complaints deliberately created by Dickleman.

153. Piazza breached her duty of loyalty to Diamond by utilizing Diamond's trade secrets against Diamond and by using sales tactics in an effort to harm Diamond.

154. Diamond has suffered damages as a result thereof.

**WHEREFORE**, Diamond respectfully requests that this Court, enter a final judgment in its favor and against Piazza, individually, jointly and severally, awarding Diamond damages, attorneys' fees, costs, and pre- and post-judgment interest, and for such other and further relief as this Court deems appropriate.

### COUNT XII
### Breach of Duty of Loyalty (Against Tyler Individually)

155. Diamond realleges paragraphs 1 through 55, 69, and 72 through 76 as if fully set forth hereinbelow.

156. This is a cause of action for breach of duty of loyalty.

157. Upon information and belief, Tyler induced or otherwise encouraged the other Former Employees to terminate their employment with Diamond and to instead work for Chudy, Tucker, and MRC.

158. Upon information and belief, as he was planning his departure from Diamond, and in anticipation of joining MRC, Tyler undertook a scheme to further harm Diamond by engaging

in sales practices that did not comply with Diamond's standards.

159.　Upon information and belief, Tyler deliberately engaged in sales practices he knew were inappropriate in order to create consumer complaints against Diamond and force Diamond to have to take actions to protect its business and reputation, and to resolve consumer complaints deliberately created by Tyler.

160.　Tyler breached his duty of loyalty to Diamond by utilizing Diamond's trade secrets against Diamond and by using sales tactics in an effort to harm Diamond.

161.　Diamond has suffered damages as a result thereof.

**WHEREFORE**, Diamond respectfully requests that this Court, enter a final judgment in its favor and against Tyler, individually, jointly and severally, awarding Diamond damages, attorneys' fees, costs, and pre- and post-judgment interest, and for such other and further relief as this Court deems appropriate.

## COUNT XIII
## Breach of Duty of Loyalty (Against Wood Individually)

162.　Diamond realleges paragraphs 1 through 55, 69, and 72 through 76 as if fully set forth hereinbelow.

163.　This is a cause of action for breach of duty of loyalty.

164.　Upon information and belief, Wood induced or otherwise encouraged the other Former Employees to terminate their employment with Diamond and to instead work for Chudy, Tucker, and MRC.

165.　Upon information and belief, as she was planning her departure from Diamond, and in anticipation of joining MRC, Wood undertook a scheme to further harm Diamond by engaging in sales practices that did not comply with Diamond's standards.

166.　Upon information and belief, Wood deliberately engaged in sales practices she

knew were inappropriate in order to create consumer complaints against Diamond and force Diamond to have to take actions to protect its business and reputation, and to resolve consumer complaints deliberately created by Dickleman.

167.    Wood breached her duty of loyalty to Diamond by utilizing Diamond's trade secrets against Diamond and by using sales tactics in an effort to harm Diamond.

168.    Diamond has suffered damages as a result thereof.

**WHEREFORE**, Diamond respectfully requests that this Court, enter a final judgment in its favor and against Wood, individually, jointly and severally, awarding Diamond damages, attorneys' fees, costs, and pre- and post-judgment interest, and for such other and further relief as this Court deems appropriate.

### COUNT XIV
### Violation of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B)
### (against CLS, Snellen, Hemingway, Chudy, and Tucker)

169.    Plaintiff realleges and reincorporate the allegations contained in paragraphs 1 through 76 above as if more fully set forth herein.

170.    This is an action for violation of the Lanham Act, 15 U.S.C. § 1125(a)(1).

171.    CLS, Snellen, Hemingway, Chudy, and Tucker all willfully, deliberately, and egregiously made false or misleading statements of fact in their commercial advertisements and intended to mislead owners of Diamond timeshare interests ("Diamond Owners"). The statements described above and incorporated herein were literally false, either on their face or by necessary implication.

172.    The representations described above were commercial speech made by a defendant acting in competition to Plaintiff by trying to interfere with Plaintiff's business relationships for CLS, Snellen, Hemingway, Chudy, and Tuckers' own ill-gotten financial gain, for the purpose of

influencing Diamond Owners to retain their services, and were disseminated sufficiently to the timeshare owning public to constitute advertising or promotion within the timeshare industry.

173.    CLS, Snellen, Hemingway, Chudy, and Tuckers' false or misleading statements either deceived or had the capacity to deceive a substantial segment of Diamond Owners.

174.    CLS, Snellen, Hemingway, Chudy, and Tuckers' deception is material, in that it is likely to influence the Diamond Owners' decision whether to retain Defendants' services or to cease making payments to Plaintiff.

175.    Plaintiff has been and are likely to be injured as a result of the false and/or misleading statements.

**WHEREFORE,** Diamond respectfully requests that this Court enter final judgment in its favor and against CLS, Snellen, Hemingway, Chudy, and Tucker, jointly and severally, for damages, attorneys' fees, and costs, and for permanent injunctive relief enjoining these defendants from engaging in any false or deceptive advertising, and for such other and further relief as this Court deems appropriate.

**COUNT XV**
**Common Law False Advertising**
**(against CLS, Snellen, Hemingway, Chudy, and Tucker)**

176.    Plaintiff realleges and reincorporate the allegations contained in paragraphs 1 through 76 above as if more fully set forth herein.

177.    This is an action for violation of the Lanham Act, 15 U.S.C. § 1125(a)(1).

178.    CLS, Snellen, Hemingway, Chudy, and Tucker all willfully, deliberately, and egregiously made false or misleading statements of fact in their commercial advertisements and intended to mislead owners of Diamond timeshare interests ("Diamond Owners").  The statements

described above and incorporated herein were literally false, either on their face or by necessary implication.

179.    The representations described above were commercial speech made by a defendant acting in competition to Plaintiff by trying to interfere with Plaintiff's business relationships for CLS, Snellen, Hemingway, Chudy, and Tuckers' own ill-gotten financial gain, for the purpose of influencing Diamond Owners to retain their services, and were disseminated sufficiently to the timeshare owning public to constitute advertising or promotion within the timeshare industry.

180.    CLS, Snellen, Hemingway, Chudy, and Tuckers' false or misleading statements either deceived or had the capacity to deceive a substantial segment of Diamond Owners.

181.    CLS, Snellen, Hemingway, Chudy, and Tuckers' deception is material, in that it is likely to influence the Diamond Owners' decision whether to retain Defendants' services or to cease making payments to Plaintiff.

182.    Plaintiff has been and are likely to be injured as a result of the false and/or misleading statements.

**WHEREFORE,** Diamond respectfully requests that this Court enter final judgment in its favor and against CLS, Snellen, Hemingway, Chudy, and Tucker, jointly and severally, for damages, attorneys' fees, and costs, and for permanent injunctive relief enjoining these defendants from engaging in any false or deceptive advertising, and for such other and further relief as this Court deems appropriate.

**COUNT XV**
**Tortious Interference**
**(against CLS, MRC, Snellen, Hemingway, Chudy, and Tucker)**

183.    Plaintiff realleges and reincorporate the allegations contained in paragraphs 1 through 76 above as if more fully set forth herein.

184.    This is a cause of action for tortious interference with existing contracts and for damages in excess of Seventy Five Thousand and 00/100 Dollars ($75,000.00), exclusive of interest, attorney's fees and costs, and is within this Court's jurisdiction.

185.    Plaintiff has valid and legally enforceable contracts with Diamond Owners for their timeshare units.

186.    CLS, MRC, Snellen, Hemingway, Chudy, and Tucker have knowledge of those relationships. The very fact that Plaintiff has a business relationship with the Diamond Owners is the basis under which these defendants sought to establish a relationship with the Diamond Owners.

187.    The willful actions of CLS, MRC, Snellen, Hemingway, Chudy, and Tucker to induce parties with whom Plaintiff has valid contractual agreements breach those agreements constitutes intentional interference with existing contracts. These defendants induce Diamond Owners into breaching their contracts with Diamond by making false and/or misleading statements to Diamond Owners; but-for those false statements the Diamond Owners would not breach their valid, binding timeshare agreements with Diamond.

188.    CLS, MRC, Snellen, Hemingway, Chudy and Tucker have intentionally and without justification or privilege interfered with Diamond's existing contracts by convincing Diamond Owners to immediately stop making any further payments under their contracts without any legal basis therefor.

189.    The actions of CLS, MRC, Snellen, Hemingway, Chudy, and Tucker were not made in good faith, but rather were made with the knowledge and purpose to injure Diamond or with reckless disregard for the attendant consequences naturally, directly, and proximately resulting from their conduct and actions and without reasonable grounds for CLS, MRC, Snellen,

Hemingway, Chudy, and Tucker to believe that their actions were justified and proper.

190.    As a direct and proximate result of the intentional misconduct of CLS, MRC, Snellen, Hemingway, Chudy, and Tucker, Diamond Owners have terminated, or have sought to terminate, their contractual relationships with Diamond before the expiration of the terms of those contracts.

191.    CLS, MRC, Snellen, Hemingway, Chudy, and Tucker have no justification or privilege in procuring the breach of such contracts.

192.    As a direct and proximate result of the foregoing, Diamond suffered damages.

**WHEREFORE,** Diamond respectfully requests that this Court enter final judgment in its favor and against CLS, MRC, Snellen, Hemingway, Chudy, and Tucker, jointly and severally, for damages and costs, and for such other and further relief as this Court deems appropriate

DATED: August 31, 2018                    Respectfully submitted,

*/s/ Neal F. Perryman*
Neal F. Perryman, #43057MO
Oliver H. Thomas, #60676MO
**LEWIS RICE LLC**
600 Washington Avenue, Suite 2500
St. Louis, MO 63101
Telephone: (314) 444-7661
Facsimile: (314) 612-7661
nperryman@lewisrice.com
othomas@lewisrice.com

and

Alfred J. Bennington, Jr. (*Pro Hac Vice*)
Daniel J. Barsky (*Pro Hac Vice*)
Glennys Ortega Rubin (*Pro Hac Vice*)
**SHUTTS & BOWEN LLP**
200 South Biscayne Boulevard, Suite 4100
Miami, Florida 33131
Telephone:  (407) 835-6755
Facsimile:   (407) 849-7255
bbennington@shutts.com
grubin@shutts.com
dbarsky@shutts.com

*Attorneys for Diamond Resorts Corporation*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and accurate copy of the foregoing was served via this Court's CM/ECF filing system this 31st day of August, 2018.

_____/s/ Neal F. Perryman_____